1  G. MARK ALBRIGHT, ESQ. (#1394)
   DANIEL R. ORMSBY, ESQ. (#14595)
2  **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
   801 South Rancho Drive, Suite D-4
3  Las Vegas, Nevada 89106
   Telephone: (702) 384-7111
4  Facsimile: (702) 384-0605
   Email: *gma@albrightstoddard.com*
5          *dormsby@albrightstoddard.com*

6  MATTHEW B. GEORGE (*pro hac vice* forthcoming)
   BLAIR E. REED (*pro hac vice* forthcoming)
7  **KAPLAN FOX & KILSHEIMER LLP**
   1999 Harrison Street, Suite 1560
8  Oakland, CA 94612
   Telephone: 415-772-4700
9  Facsimile: 415-772-4707
   Email: *mgeorge@kaplanfox.com*
10         *breed@kaplanfox.com*

11  [Additional Counsel Listed on Signature Page]

12  *Attorneys for Plaintiff and the Proposed Classes*

13

14              **UNITED STATES DISTRICT COURT**

15              **DISTRICT OF NEVADA**

16

17  ANGELA BOYKIN, individually and on          Case No.
    behalf of all others similarly situated,
18
19                          Plaintiff,          **CLASS ACTION COMPLAINT**

20         v.                                   **DEMAND FOR JURY TRIAL**

21  NATIONAL ASSOCIATION OF
    REALTORS; UMRO REALTY CORP.
22  d/b/a The Agency; CHASE
    INTERNATIONAL, INC.; DICKSON
23  REALTY, INC.; COMPASS, INC.; eXp
    WORLD HOLDINGS, INC.; THE REAL
24  ESTATE GUY INC.; BHH AFFILIATES,
    LLC; DOUGLAS ELLIMAN INC.;
25  DOUGLAS ELLIMAN REALTY, LLC;
    HOMESMART INTERNATIONAL LLC;
26  CRAIG TANN, LTD d/b/a
    HUNTINGTON & ELLIS A REAL
27  ESTATE AGENCY; REALTY ONE
    GROUP; REALTY ONE GROUP
28  EMINENCE; REDFIN CORPORATION;
    URBAN NEST REALTY, LLC;

                         1

1 NEVADA REALTORS; GREATER LAS
VEGAS ASSOCIATION OF
2 REALTORS; GREATER LAS VEGAS
ASSOCIATION OF REALTORS
3 MULTIPLE LISTING SERVICE, INC.;
ELKO COUNTY REALTORS; INCLINE
4 VILLAGE REALTORS, INC.; SIERRA
NEVADA REALTORS; NORTHERN
5 NEVADA REGIONAL MULTIPLE
LISTING SERVICE, INC.; MESQUITE
6 REAL ESTATE ASSOCATION, INC., A
NEVADA NON-PROFIT
7 CORPORATION;
Defendants.
8

9        Angela Boykin ("Plaintiff"), brings this action on behalf of herself and on behalf of
10
the Class consisting of all persons who listed properties on a Multiple Listing Service in
11
Nevada using a listing agent or broker affiliated with one of the Defendants named herein and
12
paid a buyer broker commission from four years prior to the filing of this complaint, until
13
the present ("the Class Period"). In support thereof, Plaintiff respectfully alleges as follows:
14

15        1.        The creator of the conspiracy is the National Association of Realtors
16 ("NAR"), a trade association for real estate brokers with over 1.5 million individual
17 members. NAR conspired with its largest affiliated associations in Nevada and some of the
18 largest real estate brokerages that worked in Nevada during the Class Period.

19        2.        Defendants include NAR, and the following brokerages: UMRO Realty
20 Corp. d/b/a The Agency, ("The Agency"), Chase International Real Estate ("Chase
21 International"), Dickson Realty ("Dickson"), Compass, Inc. ("Compass"), eXp World
22 Holdings, Inc. ("eXp"), The Real Estate Guy, BHH Affiliates, LLC ("BHHS"), Douglas
23 Elliman Inc. ("DEI"), Douglas Elliman Realty, LLC ("DER"), HomeSmart International
24 LLC ("HomeSmart"), Craig Tann, LTD d/b/a Huntington & Ellis A Real Estate Agency
25 ("Huntington & Ellis"), Realty One Group ("Realty One"), Realty One Group Eminence,
26 Redfin Corporation ("Redfin"), Urban Nest Realty ("Urban Nest") (the "Broker
27
28
                                         2

Defendants")[1]. Also included are the named regional Realtor associations and multiple listing services ("MLS").

3.      An MLS is a database and platform used by real estate agents and brokers to share information about properties for sale and find available listings for prospective buyers.

4.      MLSs act as reservoirs of property listings available for sale in defined geographic regions, and thus play a pivotal role in the real estate ecosystem. Most homes in the United States are traded through MLS platforms, where brokers are often obligated to include all properties. These MLSs are primarily governed by local NAR associations, and access is granted contingent upon broker compliance with NAR's mandatory regulations outlined in the Handbook on Multiple Listing Policy. This handbook explicitly incorporates the Mandatory Offer of Compensation Rule, which require all home sellers to agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation when listing a property.

**A.      NAR's Regulatory Dominion and Mandatory Offer of Compensation Rule**

5.      NAR, an organization with considerable influence in shaping the real estate landscape, is at the core of the conspiracy.

6.      NAR wields its regulatory authority to impose a rule known as the "Mandatory Offer of Compensation Rule." This rule dictates that every property seller, when listing their home on an MLS affiliated with a local NAR association, must make a sweeping, non-negotiable offer of compensation to buyer brokers. The Defendants, acting in concert with NAR, pressurize or incentivize their franchisees, brokers, and agents to become NAR members and adhere to its regulatory regime. Through this concerted effort, they ensure the implementation and enforcement of the Mandatory Offer of Compensation Rule.

---

[1] Plaintiff also alleges that real estate brokerages Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and RE/MAX LLC ("RE/MAX"), along with their subsidiaries, would be named as defendants in this Complaint, but for the recently approved settlement in *Sitzer et al v. National Association of Realtors et al*, Case No. 4:19-cv-00332-SRB (W.D. Mo.). *See* November 20, 2023 Order Approving Plaintiffs' Motion for Preliminary Settlements, Dkt. No. 1321.

3

**B.    Stifling Competitive Markets**

7.    In many MLSs, NAR compels broker compliance with rules that curtail competition. Furthermore, each Defendant mandates or encourages their franchisees, brokerages, and individual realtors to join NAR and implement its anticompetitive regulations, including the Mandatory Offer of Compensation Rule, as a prerequisite for enjoying the benefits of Defendants' branding, brokerage support, and other resources.

8.    As prominent brokers in Nevada, their involvement in the alleged conspiracy, manifested through the implementation and enforcement of its rules and policies, is indispensable to the conspiracy's prosperity.

9.    These anticompetitive measures favor the Defendants by enabling brokers to impose charges on home sellers beyond competitive thresholds and thwarting competition from innovative or lower-cost alternatives.

**C.    Home Seller Burden**

10.    The alleged conspiracy compels home sellers to bear a cost that, in a competitive market and in the absence of the Defendants' anticompetitive restraint, would typically be borne by the homebuyer.

11.    Further, this has led to an industry-recognized practice called "steering," where homeowners are pressured into accepting inflated or stabilized rates out of fear that buyer brokers will not otherwise show their home to prospective buyers.

**D.    Competitive Imbalance**

12.    In the absence of NAR's Mandatory Offer of Compensation Rule, the expense of buyer broker commissions would be incurred by their clients (homebuyers). This would lead to competition among buyer brokers to offer lower commission rates.

13.    Consequently, the Mandatory Offer of Compensation Rule stifles price competition among buyer brokers because the actual party retaining the buyer broker—the homebuyer—doesn't negotiate or pay the commission for their broker.

### E.   Anticompetitive Effects

14.   Adding to the anticompetitive implications of the Mandatory Offer of Compensation Rule, NAR's rules also forbid buyer brokers from making home purchase offers that hinge on reducing the buyer broker's commission.

15.   The conspiracy has led to various illogical, harmful, and anticompetitive effects, including: (a) requiring sellers to pay overcharges for services provided by buyer brokers to the buyer; (b) maintaining, fixing, and stabilizing buyer broker compensation at levels that would not exist in a competitive market; and (c) promoting steering and actions that hinder innovation and entry by new, lower-cost real estate brokerage service providers.

16.   In competitive overseas markets, when homebuyers opt to use a broker, they personally cover the cost, which is less than half of what American buyer brokers receive.

17.   As a result, Defendants' conspiracy has inflated and stabilized buyer broker commissions, resulting in higher total commissions paid by home sellers like Plaintiff and Class members. Plaintiff and Class members have each incurred, on average, thousands of dollars in overcharges and damages due to Defendants' alleged conspiracy.

### F.   Defendants' Alleged Roles

18.   Defendants leverage their control over MLSs, their agreements with local franchisees and agents, their employee policies, and their active roles within NAR and local realtor associations to compel local residential real estate brokers to comply with NAR's regulations, including the Mandatory Offer of Compensation Rule.

19.   Defendants also play a part in implementing the conspiracy by reviewing NAR's Rules and consenting to them at annual meetings, and NAR perpetuates the conspiracy by periodically reissuing its Rules, which include the Mandatory Offer of Compensation Rule. Additionally, Defendants are involved in the conspiracy by serving on boards and committees that oversee compliance with NAR Rules.

20.   Plaintiff, on behalf of themselves and the Class, bring this lawsuit against Defendants for alleged violations of federal and state antitrust laws, seeking treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

22.     This Court has personal jurisdiction over Defendants. They have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

23.     Each Defendant has received revenue attributable to business transacted in Nevada and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Nevada and in this District.

24.     Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391 because Defendants do substantial business in this District, have intentionally availed themselves of the laws and markets within this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

25.     The Mandatory Offer of Compensation Rule and other anticompetitive rules promulgated by NAR have been extended and enforced by Defendants and their co-conspirators in interstate commerce, including this District. These rules govern local NAR associations, local brokers, and local sales agents across the entire nation. Defendants' conduct, as alleged, has led to the inflation of buyer broker commissions nationwide, causing harm to home sellers in numerous regions. Through Defendants, other NAR members, and additional co-conspirators, NAR conducts business in interstate commerce,

engaging in activities that substantially impact interstate trade within the United States.

## PARTIES

### A.    Plaintiff

26.    Plaintiff Angela Boykin is a resident of Minnesota. In April 2022, Plaintiff sold her Las Vegas, Nevada property. Plaintiff used ERA Brokers Consolidated as the listing agent, and Realty One Group, Inc. was the selling agent. Plaintiff paid a $13,125.00 commission to the listing agent, or 2.5% of the sale price, and a $13,125.00 commission to the buyer's agent, or 2.5% of the sale price, for a grand total of $26,250.00.

### B.    Defendants

27.    National Association of Realtors ("NAR"), is a lobbying group that advocates for the interests of real estate brokers, has over 1.5 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees state and territorial realtor associations as well as over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

*Broker Defendants*

28.    UMRO Realty Corp. d/b/a The Agency, is globally recognized boutique real estate brokerage. The Agency is a Delaware company with its headquarters in Beverly Hills, California. The Agency conducts significant business throughout the United States and has at least one office in this District.

29.    Chase International Real Estate ("Chase International") is an independent, privately owned real estate firm with its headquarters in Zephyr Cove, Nevada.  Chase International transacts significant business in this District, and serves its community with offices in Zephyr Cove, Glenbrook, Incline Village, South Lake Tahoe, Tahoe City, Squaw Valley, Truckee, Reno, Sparks, and Carson Valley.

30.    Dickson Realty is a privately held, full-service real estate brokerage serving Northern Nevada and Lake Tahoe since 1973. Dickson is a Nevada corporation with its headquarters in Reno, Nevada. Dickson has conducts significant business in Nevada and

has multiple offices in this District.

31.     Compass, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in New York. Compass states that is the largest independent real estate brokerage by gross transaction value. Compass transacts significant business throughout the United States and has at least one office in this District.

32.     eXp World Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. Upon information and belief, eXp offers its real estate brokerage services in this District through its subsidiaries The Real Estate Guy and Craig Team Realty. eXp has brokerages throughout the United States and at least one office in this District. eXp transacts significant business throughout the United States and has at least one office in this District.

33.     The Real Estate Guy is a Delaware corporation with its principal place of business in Las Vegas, Nevada. The Real Estate Guy transacts significant business in this District.

34.     BHH Affiliates, LLC, operates as Berkshire Hathaway Home Services and is a Delaware corporation with headquarters in Irvine, California. BHHS transacts significant business throughout the United States and this District.

35.     Douglas Elliman Inc. is a publicly traded Delaware corporation with headquarters in Miami, Florida. DEI transacts significant business throughout the United States and this District.

36.     Douglas Elliman Realty, LLC is headquartered in New York, New York. Upon information and belief, DER is a wholly owned subsidiary of DEI, and is the largest subsidiary owned by DEI. DEI transacts significant business throughout the United States and this District, and maintains at least two offices in Nevada.

37.     HomeSmart International LLC is an Arizona corporation headquartered in Scottsdale, Arizona. HomeSmart International LLC transacts significant business throughout the United States and this District. HomeSmart has at least two offices in Las Vegas, Nevada.

38.     Craig Tann, LTD d/b/a Huntington & Ellis A Real Estate Agency is a Nevada corporation headquartered in Las Vegas. Huntington & Ellis states that they have over $2 billion in residential sales over the past three years and transact significant business throughout Nevada and this District.

39.     Realty One Group, Inc. is a Nevada corporation headquartered in Las Vegas. Realty One transacts significant business throughout Nevada and this District. Realty One has several offices in this District and throughout Nevada.

40.     Realty One Group Eminence is headquartered in Reno, Nevada and operated by Ryan Borden. Realty One Group Eminence has offices in Reno and Carson City, Nevada and states that it is the "fastest growing real estate company in Northern Nevada" and transacts significant business throughout the state of Nevada.

41.     Redfin Corporation is a publicly traded company headquartered in Seattle, Washington. Redfin states that its website and mobile applications reach over 51 million users. Redfin transacts significant business throughout the United States and this District, and maintains offices throughout Nevada.

42.     Urban Nest Realty is a residential real estate brokerage with offices in Henderson, Nevada and Las Vegas, Nevada. Urban Nest transacts significant business throughout Nevada and in this District.

*Regional Association and MLS Defendants*

43.     Nevada Realtors is headquartered in Reno, Nevada and serves realtors throughout the state of Nevada. Nevada Realtors is an NAR affiliate.

44.     Greater Las Vegas Association of Realtors ("Greater Las Vegas AOR") is headquartered in Las Vegas, Nevada and serves realtors throughout Southern Nevada. Greater Las Vegas AOR states that it is the largest realtor association in Nevada and one of the top ten largest realtor associations in the United States. Greater Las Vegas AOR is an NAR affiliate.

45.     Elko County Realtors ("Elko AOR") is headquartered in Elko, Nevada and serves realtors throughout the Elko area. Elko AOR is an NAR affiliate. Upon information

and belief, Elko AOR also owns and operates Elko County Multiple Listing Service ("Elko MLS").[2]

46.     Incline Village Realtors, Inc. ("Incline AOR") is headquartered in Incline Village, Nevada and serves realtors throughout the Incline Village area. Incline AOR is an NAR affiliate. Upon information and belief, Incline AOR also owns and operates Incline Village Multiple Listing Service ("Incline MLS").[3]

47.     Sierra Nevada Realtors ("Sierra AOR") is headquartered in Carson City, Nevada and serves realtors throughout the surrounding area. Sierra AOR is an NAR affiliate.

48.     Greater Las Vegas Association of Realtors Multiple Listing Service, Inc. ("GLVA MLS") is headquartered in Las Vegas, Nevada. GVLA MLS states that it serves the Southern Nevada area. Based on information and belief, GLVA MLS is a wholly owned subsidiary of Greater Las Vegas AOR.[4]

49.     Northern Nevada Regional Multiple Listing Service, Inc. ("NNR MLS") is headquartered in Reno, Nevada. NNR MLS states that it serves the Reno Sparks, Carson City, Fernley, Fallon, Yerington, Minden, Gardnerville, East Lake Tahoe, and Topaz areas.

50.     Mesquite Real Estate Association, Inc., A Nevada Non-Profit Corporation, ("Mesquite MLS") is headquartered in Mesquite, Nevada, and serves the surrounding area. The Mesquite MLS's mission is to operate a multiple listing service for the Greater Mesquite Nevada area, and to ensure compliance with MMLS policies, rules and regulations while holding our members accountable to upholding the highest professional standards and ethical conduct as mandated by NAR's Code of Ethics.[5]

/ / /

/ / /

---

[2] *See* https://www.elkorealtors.com/search/ (last visited Feb. 14, 2024).
[3] *See* https://inclinevillagerealtors.com/ivr-mls-search/ (last visited Feb.14, 2024).
[4] *See* https://members.lasvegasrealtor.com/mls/pdf/MLS-Rules-And-Regulations.pdf (last visited Feb. 14, 2024).
[5] *See* https://www.mreaonline.com (last visited Feb. 14, 2024).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FACTS

## A.    Real Estate Market in Nevada

51.    Most states, including Nevada, have licensing laws that regulate who can represent buyers and sellers in real estate transactions. In 2022, approximately 86% of home sellers and buyers in the United States utilized the services of real estate brokers.[6] These regulations classify real estate professionals into two primary categories: (1) real estate brokers, often referred to as "brokerage firms," and (2) individual real estate licensees or agents. These brokers license and assume legal responsibility for the actions of individual real estate realtors or agents.

52.    In Nevada, only licensed brokers are authorized to receive compensation for representing home buyers or sellers in real estate transactions. Consequently, all real estate brokerage contracts must be established with brokers, not agents, and payments to individual agents or realtors are routed through brokers. Many brokers, along with their respective agents, often operate in dual roles, acting as seller brokers for some property sales and as buyer brokers for others.

53.    In standard residential real estate transactions, brokers and agents receive compensation in the form of commissions, calculated as a percentage of the property's sale price, with the payment being realized upon the sale's completion.

54.    Compensation for seller brokers is stipulated in a listing agreement, a contract signed between the seller and the seller broker. This agreement outlines the listing terms and often grants the seller broker exclusive marketing rights to the property. The listing agreement also specifies the total commission to be paid by the seller.

55.    When a buyer engages a broker's services, they typically enter into a contract with that broker. If a buyer retains a broker, the seller remits the buyer broker's compensation. Historically, NAR's Code of Ethics espoused a conduct standard that falsely suggested to buyers that their agent's services are provided at no cost.

---

[6]*See* https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics (last visited Feb. 14, 2024).

56.     The net effect of these agreements and the Mandatory Offer of Compensation Rule is that buyer brokers, who are tasked with representing the buyers' interests against the sellers, receive their compensation from the overall commission paid by the seller, not from the buyers they represent. This has led to significant confusion regarding the functioning of commissions within the real estate market such that many sellers do not understand how and why they are paying the buyer's agent a 3% commission.

57.     Without the Mandatory Offer of Compensation Rule and in a competitive market context (where sellers have no incentive to compensate a buyer broker who works against their interests), buyers would directly pay their brokers. Sellers, in turn, would exclusively pay a commission to their seller broker. Consequently, the seller's total broker commission would amount to approximately half or less of the customary commission paid to remunerate both their seller broker and the buyer's broker, who is advocating for the buyer's interests.

**B.      Role of Multiple Listing Services (MLSs) and the Mandatory Offer of Compensation Rule**

58.     MLSs serve as central repositories for available properties within specific geographic areas, offering access to real estate brokers and their affiliated realtors or agents who adhere to MLS regulations. Many MLSs are owned and managed by local realtor associations, which are members of NAR.

59.     Several MLSs exist in Nevada,[7] many of which have the same Mandatory Offer of Compensation Rule set forth by NAR.

60.     For example, GLV MLS effectively adopts NAR's Mandatory Offer of Compensation Rule vis-à-vis Section 8, which states that: "In filing a property with the Multiple Listing Service of an Association of REALTORS® the Participant of the Service is making blanket unilateral offers of compensation to the other MLS Participants, and shall therefore specify, on each listing filed with the Service, the compensation being offered to

---

[7] *See* https://idxbroker.com/idx_mls_coverage.php (last visited Feb. 14, 2024).

1    the other MLS Participants."[89]

2        61.    GLV MLS further states that "[a] Multiple Listing Service is a means by

3    which authorized Participants make blanket unilateral offers of compensation to other

4    Participants[.]"[10]

5        62.    NAR regulations mandate that seller brokers must list their clients'

6    properties on an MLS. Notably, the failure to list a client's property on an MLS results in

7    diminished visibility for that property, as it is less likely to be presented to potential buyers

8    by buyer brokers.

9        63.    The Mandatory Offer of Compensation Rule imposes an obligation on seller

10   brokers, acting on behalf of their clients, to make a comprehensive, non-negotiable offer of

11   compensation to buyer brokers whenever they list a property on an MLS affiliated with a

12   local NAR association. In the event that a buyer, who is represented by a broker, ultimately

13   purchases the property, the buyer broker is entitled to the offered compensation.

14   **C.    Anticompetitive NAR Rules**

15       64.    NAR introduced the Mandatory Offer of Compensation Rule in 1996,

16   incorporating it into the Handbook on Multiple Listing Policy. This rule has remained in

17   effect since its inception.

18       65.    Before the adoption of the Mandatory Offer of Compensation Rule in 1996,

19   upon information and belief, NAR played a central role in structuring, implementing, and

20   enforcing a similar and equally flawed market structure. Under this system of sub-agency,

21   brokers representing buyers were legally obligated to act in the interest of sellers, even when

22   primarily working with buyers. As a result, the practice of sellers compensating both their

23   selling broker and the buyer's broker persisted.

---

24   [8] *See* https://members.lasvegasrealtor.com/mls/pdf/MLS-Rules-And-Regulations.pdf (last
25   visited Feb. 14, 2024).
    [9] As of January 3, 2024, the GVL MLS and Greater Las Vegas AOR have amended
26   Section 8, the analog Mandatory Offer of Compensation Rule. *See*
    https://members.lasvegasrealtor.com/news/article/mls-rules-and-regulations-update (last
27   visited Feb. 14, 2024).
    [10] *Id.*

28

66.     The inefficiency and confusion inherent in this sub-agency system ultimately led to its collapse when widely exposed in the media.

67.     Following the collapse of the sub-agency system, NAR and its co-conspirators devised and enforced an anticompetitive scheme aimed at perpetuating supra-competitive commissions, impeding innovation, and hindering lower-priced competition. This was accomplished through the Mandatory Offer of Compensation Rule, officially adopted in November 1996.

68.     NAR's Board of Directors and associated committees periodically evaluate and revise the policies in the Handbook. The Mandatory Offer of Compensation Rule has been retained despite criticism from economists and industry experts, who argue that the rule contributes to anticompetitive market conditions and inflated commission rates.

69.     Defendants have actively participated in this anticompetitive scheme by agreeing to follow, promote, and implement the Mandatory Offer of Compensation Rule. These actions have established an environment that perpetuates high commissions and restricts market competition. Indeed, in the Inman Survey (2014), 56% of agents reported that their brokerages require a minimum total commission level to list homes for sellers and brokerages specify a minimum commission rate that must be offered to buyer agents when the brokerages represent the seller.

70.     Furthermore, NAR has invited Defendants and other co-conspirators to join an agreement, whereby participation in the MLS system is contingent upon compliance with anticompetitive restraints set forth in the Handbook. Regardless of their initial involvement in drafting or adopting the Mandatory Offer of Compensation Rule, Defendants have since joined the conspiracy and committed to upholding and enforcing the rule.

71.     The Handbook explicitly states the Mandatory Offer of Compensation Rule, requiring participants to make unilateral compensation offers when filing properties with an MLS. The Handbook also stipulates that MLSs should not publish listings that do not

14

include compensation offers or invitations for participants to discuss cooperative relationships.

72.    The Mandatory Offer of Compensation Rule transfers a cost that would ordinarily be paid by the buyer, in a competitive market, to the seller. Home sellers effectively become obligated to hire a buyer broker if they want to list their property on an MLS. The system violates antitrust laws by keeping buying agents compensated despite offering limited services. Indeed, in the age of the internet where a buyer is able to search and locate their next house on their computer or smartphone without the assistance of a real estate agent—and they often do just that—a competitive market should have forced lower buyer broker commissions as a reflection of the decreasing need for their services.

73.    In their efforts to steer clients towards homes offering higher commissions, buyer brokers utilize the offered compensation amounts. This steering practice is confirmed by economic literature and has clear anticompetitive effects, making it difficult for brokers to compete based solely on the services they provide to clients.

74.    Defendants and other co-conspirators also employ technology to facilitate steering based on MLS commission information.

**D.    Defendants' Participation in the Conspiracy**

75.    Defendants, in collaboration with NAR, have actively supported, implemented, and enforced the Mandatory Offer of Compensation Rule. They have required their franchisees, brokers, agents, and employees to comply with NAR rules, including the Mandatory Offer of Compensation Rule.

76.    Therefore, Defendants and their franchisees, along with their agents, have furthered the conspiracy by agreeing to implement, follow, and enforce NAR's rules, including the Mandatory Offer of Compensation Rule.

**E.    Effects of the Conspiracy**

77.    The conspiracy led by Defendants and NAR has had several anticompetitive

15

effects in Nevada, including:

- **Inflated Costs and Compelled High Commissions for Home Sellers**: The Defendants' conspiracy in Nevada has resulted in inflated costs for home sellers. They are compelled to pay commissions to buyer brokers who, paradoxically, represent their adversaries in property negotiations. This practice also compels home sellers to set high buyer broker commissions, which in turn diminishes their control over expenses and market competitiveness.

- **Payment of Inflated Commissions and Price Competition Restraint**: The conspiracy perpetuates the payment of inflated buyer broker commissions and total commissions by home sellers, reducing the financial benefit sellers derive from property transactions. This anticompetitive conduct significantly restrains price competition among brokers in Nevada. Both buyers seeking to retain broker services and sellers seeking to list their properties find their choices constrained by this manipulative environment.

- **Separation of Buyer Broker Retention and Commission Setting**: The conspiracy has effectively separated the retention of buyer brokers from the setting of broker commissions. In this distorted system, the home buyer now directly retains the services of a buyer broker, while the seller's agent determines the compensation for the buyer broker, exacerbating inefficiencies within the market.

78.     There are no pro-competitive effects stemming from the conspiracy, which is unequivocally anticompetitive and detrimental to the competitive landscape. And any alleged pro-competitive benefits within the MLS system do not justify the Mandatory Offer of Compensation Rule, as they are substantially outweighed by its anticompetitive effects including restraining price competition and encouraging steering.

79.     Comprehensive economic evidence supports the notion that the conspiracy has resulted in inflated total commissions and buyer broker commissions paid by home sellers, far exceeding what a competitive market would dictate.

80.     In comparison to other countries with competitive real estate markets, commission rates in the United States are significantly higher, including in Nevada where the average commission falls between 5-6%.[11] This high commission rate prevails in the face of the realities of modern home buying where many buyers find by themselves the homes they ultimately purchase on the internet, a fact that should have radically driven

---

[11]*See* https://listwithclever.com/average-real-estate-commission-rate/nevada/ (last visited Feb. 14, 2024).

down the cost of a buyer's agent's fee. Nonetheless, a large majority (73%) of agents say they will not negotiate their commissions, a stance that would be untenable in a competitive market.[12]

### F.    Defendants' Market Power in Relevant Nevada Counties

81.    The relevant market for the claims herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with access to MLSs. Defendants' control of MLSs allows them to impose anticompetitive NAR rules on Class members and other market participants.

82.    The relevant geographic markets for the claims asserted herein are no broader than the geographic areas within Nevada in which the Defendants operate. The vast majority of homes sold in this county were listed on MLSs by brokers subject to NAR regulations, including the Mandatory Offer of Compensation Rule or its functional equivalent.

83.    Defendants and their co-conspirators collectively possess significant market power within each relevant market. Their influence is achieved through their participation and control over local MLSs and their substantial share of the local market.

84.    Non-conspiring brokers who aim to compete outside the conspiracy face insurmountable barriers:

- Access to MLSs is essential for brokers to effectively serve buyers and sellers in the market.

- An alternative listing service aiming to compete with an MLS would require listings that are as comprehensive as an MLS, but brokers within the conspiracy lack the incentive to participate in such a service.

- Home buyers and sellers would be reluctant to utilize a new alternative listing service without a proven track record.

- NAR advises MLSs to enter into non-compete agreements with third-party websites.

---

[12]*See* https://www.cnbc.com/2019/10/30/realtor-commissions-are-not-negotiable.html (last visited Feb. 14, 2024).

### G.   Continuous Accrual

85.   Over the course of the last four years leading up to the filing of this Complaint, Defendants, in collaboration with brokers operating within MLS-covered regions, systematically applied and received buyer broker commissions and total commissions at inflated rates, all due to their ongoing conspiracy. During this timeframe, Plaintiff and other members of the Class were obliged to remit these inflated commissions in conjunction with the sale of residential real estate listed on MLSs. Each such payment over the past four years resulted in harm to Plaintiff and their fellow Class members, giving rise to new causes of action stemming from these injuries.

86.   Throughout the preceding four years, Defendants, alongside their co-conspirators, have consistently upheld, executed, and enforced the Mandatory Offer of Compensation Rule and various other anticompetitive NAR directives on a nationwide scale.

## CLASS ACTION ALLEGATIONS

87.   Plaintiff Boykin brings this action on behalf of herself, and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the members of the Class defined as:

> All persons in Nevada who used any Defendant or their affiliates as the listing broker in the sale of a property listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the property within the last four years.

88.   Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiff's counsel and employees of their law firms.

89.   The Class is readily ascertainable because records of the relevant

18

1    transactions exist.

2    90.    Class members are so numerous that individual joinder of all its members is

3    impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that

4    the Class has many thousands of members, the exact number and their identities being

5    known to Defendants and their co-conspirators.

6    91.    Plaintiff will fairly and adequately protect the interests of the members of

7    the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other

8    members of the Class.

9    92.    Common questions of law and fact exist as to all members of the Class and

10   predominate over any question affecting only individual Class members. These common

11   legal and factual questions, each of which also may be certified under Rule 23(c)(4), include

12   but are not limited to the following:

13          a.    Whether Defendants engaged in the alleged conspiracy;

14          b.    Whether the conduct of Defendants' and their co-conspirators

15                caused injury to the business or property of Plaintiff and the other

16                members of the Classes;

17          c.    Whether the effect of Defendants' conspiracy was to inflate

18                both  total commissions and buyer broker commissions;

19          d.    Whether the competitive harm from the conspiracy substantially

20                outweighs any competitive benefits;

21          e.    Whether Defendants' conduct is unlawful; and

22          f.    The appropriate class-wide measures of damages.

23   93.    Plaintiff's claims are typical of the claims of the members of the Class because

24   her claims arise from the same course of conduct by Defendants and the relief sought within

25   the Class is common to each member.

26   94.    Plaintiff has retained counsel competent and experienced in the prosecution

27                                    19

of antitrust class action litigation to represent themselves and the Classes. Together Plaintiff and her counsel intend to prosecute this action vigorously for the benefit of the Classes. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

96.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

g.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

h.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

i.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and

20

1            j.      injunctive relief with respect to the Class members as a whole.

2                                           **ANTITRUST INJURY**

3      97.      Defendants' anticompetitive agreements and conduct have had the

4 following effects, among others:

5            k.      Sellers of residential property have been forced to pay inflated costs

6                    to sell their homes through forced payments of commissions to buyer

7                    brokers;

8            l.      Home sellers have been faced with the fear of steering, such that they

9                    set buyer broker commissions to induce  buyer brokers to show the

10                    sellers' homes to prospective buyers;

11            m.      Price competition has been restrained among brokers seeking to be

12                    retained by home buyers, and by brokers seeking to represent home

13                    sellers; and

14            n.      Defendants and their franchisees and subsidiaries have inflated their

15                    profits by a significant margin by the increased total commissions

16                    and increased buyer broker commissions.

17      98.      By reason of the alleged violations of the antitrust laws, Plaintiff and the

18 Class have sustained injury to their businesses or property, having paid higher total

19 commissions than they would have paid in the absence of Defendants' anticompetitive

20 conspiracy, and as a result have suffered damages.

21      99.      There are no pro-competitive effects of Defendants' conspiracy that are not

22 substantially outweighed by the conspiracy's anticompetitive effects.

23      100.      Significant economic evidence supports concluding that Defendants'

24 conspiracy has resulted in Class members paying buyer broker commissions and total

25 commissions that have been inflated to a supra-competitive level.

26 / / /

27                                                  21

28

101.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

### COUNT 1
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

102.    Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

103.    Plaintiff Angela Boykin brings this action on behalf of herself and the Class.

104.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

105.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

106.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

     o.   Participated in the creation, maintenance, re-publication, and implementation of the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules;

     p.   Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules; and

     q.   Requiring franchisees of Defendants and others to implement the Mandatory Offer of Compensation Rule and other anticompetitive

22

1      r.  NAR rules, which each Defendant does through its franchise

2         agreements, policy manuals, and other contracts with its franchisees,

3         affiliates, subsidiaries, and realtors.

4    107.  Defendants' conspiracy has required sellers to pay buyer brokers, to pay an

5 inflated buyer broker commission and an inflated total commission, and it has restrained

6 price competition among buyer brokers. This harm to competition substantially outweighs

7 any competitive benefits arising from the conspiracy.

8    108.  Defendants' conspiracy has caused buyer broker commissions and total

9 commissions to be inflated. Plaintiff and the other members of the Class paid these inflated

10 commissions during (and before) the last four years in connection with the sale of residential

11 real estate. Absent Defendants' conspiracy, Plaintiff and the other Class members would

12 have paid substantially lower commissions because the broker representing the buyer of

13 their homes would have been paid by the buyer.

14    109.  Defendants' conspiracy is a *per se* violation under the federal antitrust laws,

15 specifically 15 U.S.C. § 1.

16    110.  In the alternative, Defendants' conspiracy is illegal under the federal antitrust

17 laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

18    111.  As a direct and proximate result of Defendants' past and continuing violation

19 of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff and the other Class members have

20 been injured in their business and property and suffered damages in an amount to be proven

21 at trial.

22               **COUNT 2**

23  **Violation of the Section 598A.060(2) of the Nevada Unfair Trade Practices Act**

24    112.  Plaintiff repeats and incorporates by reference each paragraph above and in

25 any other count of this Complaint.

26    113.  Plaintiff Angela Boykin brings this action on behalf of herself and the Class.

27              23

28

114. Plaintiff, the members of the Class, and Defendant are a "person" or "persons," within the meaning of Section 598A.060(2) of the Nevada Unfair Trade Practices Act ("UTPA").

115. Defendants have engaged in unfair trade practices within the meaning of the UTPA because Defendants engaged in a conspiracy by which they agreed to require sellers to pay inflated prices to the buyer broker, thereby agreeing to establish prices for commodities or services in violation of the UTPA. Defendants have further engaged in unfair trade practices within the meaning of the UTPA because Defendants' conduct, as described herein, violated the Sherman Antitrust Act.

116. As described in this Complaint, beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce by requiring sellers of residential property to make inflated payments to the buyer broker. Defendants' conduct thereby violates Section 598A.060(2) of the Nevada UTPA which makes it unlawful to agree to establish prices for commodities or services.

117. The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

118. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a. Participated in the creation, maintenance, re-publications, and implementation of the Mandatory Offer Compensation Rule and other anticompetitive NAR rules;

    b. Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules; and

  c. Requiring franchisees of Defendants and others to implement the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules, which each Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

119. Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiff and other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiff and other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

120. Defendants' conspiracy is a *per se* violation of the Section 598A.060(2) of the UTPA because Defendants conspired to agree to certain regulations that established prices for broker services.

121. In the alternative, Defendants' conspiracy is illegal under Section 598A.060(2) of the UTPA because it is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule of reason analysis.

122. As a direct and proximate result of Defendants' past and continuing violation of Section 598A.060(2) of the UTPA, Plaintiff and other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## **COUNT 3**
### **Violation of Section 598.0923(c) of the Nevada Deceptive Trade Practices Act**

123. Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

124. Plaintiff Angela Boykin brings this action on behalf herself and the Class.

25

125.    Defendants violated Section 598.0923(c) of the Nevada Deceptive Trade Practices Act ("DTPA") which makes it unlawful to knowingly violate a state or federal statute or regulation relating to the sale or lease of goods or services.

126.    Defendants knowingly violated the Sherman Act by engaging in an ongoing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.    Defendants knowingly violated the UTPA by engaging in unfair trade practices within the meaning of the UTPA because Defendants engaged in a conspiracy by which they agreed to require sellers to pay inflated prices to the buyer broker, thereby agreeing to establish prices for commodities or services in violation of the UTPA. Defendants have further engaged in unfair trade practices within the meaning of the UTPA because Defendants' conduct, as described herein, violated the Sherman Antitrust Act.

128.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and, therefore, Section 598A.060(2) of the Nevada UPTA.

129.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

130.    In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a.    Participated in the creation, maintenance, re-publications, and implementation of the Mandatory Offer Compensation Rule and other anticompetitive NAR rules;

b.    Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer

26

of Compensation Rule and other anticompetitive NAR rules; and

    c.   Requiring franchisees of Defendants and others to implement the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules, which each Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

131.    Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiff and other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiff and other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

132.    Defendants' conspiracy is a *per se* violation of the Section 598A.060(2) of the UTPA because Defendants conspired to agree to certain regulations that established prices for broker services, and because it is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

133.    In the alternative, Defendants' conspiracy is illegal under Section 598A.060(2) of the UTPA because it is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule of reason analysis.

134.    As a direct and proximate result of Defendants' past and continuing violation of Section 598.0923(c) of the Nevada DTPA, Plaintiff and other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## JURY DEMAND

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial of all issues so triable.

27

1

**PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated,

3   request relief and pray for judgment against Defendants as follows:

4      a.   An Order certifying the Class under the appropriate provisions of Rule 23 of

5           the Federal Rule of Civil Procedure, and appointing Plaintiff Boykin to

6           represent the Class, and her counsel to represent the Class;

7      b.   Declarations that the actions of Defendants, as set forth above, are unlawful;

8      c.   A permanent injunction under Section 16 of the Clayton Act enjoining

9           Defendants from (1) requiring that sellers pay the buyer broker, (2)

10          continuing to restrict competition among buyer brokers and seller brokers,

11          and (3) engaging in any conduct determined to be unlawful;

12     d.   Appropriate injunctive and equitable relief;

13     e.   An award to Plaintiff and the other members of the Class for damages and/or

14          restitution in an amount to be determined at trial;

15     f.   An award of pre- and post-judgment interest to Plaintiff;

16     g.   An award to Plaintiff for their costs of suit, including reasonable attorneys'

17          fees and expenses;

18     h.   An award of such other relief as the Court may deem just and proper.

19

20                                                Respectfully submitted,

21   DATED: February 16th, 2024              **ALBRIGHT, STODDARD, WARNICK &**
                                             **ALBRIGHT**

22                                           By: _____

23                                                G. Mark Albright

24                                           G. MARK ALBRIGHT, ESQ. (#1394)
                                             DANIEL R. ORMSBY, ESQ. (#14595)
25                                           801 South Rancho Drive, Suite D-4
                                             Las Vegas, Nevada 89106
26                                           Telephone: (702) 384-7111
                                             Facsimile: (702) 384-0605
27                                           Email: *gma@albrightstoddard.com*
                                                    *dormsby@albrightstoddard.com*
28                                           28

**KAPLAN FOX & KILSHEIMER LLP**
Matthew B. George (*pro hac vice* forthcoming)
Blair E. Reed (*pro hac vice* forthcoming)

1999 Harrison Street, Suite 1560

Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
Email:    *mgeorge@kaplanfox.com*
              *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (*pro hac vice* forthcoming)
Jeffrey P. Campisi (*pro hac vice* forthcoming)
Matthew P. McCahill (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: *ffox@kaplanfox.com*
            *jcampisi@kaplanfox.com*
            *mmccahill@kaplanfox.com*

**THE PETTIT LAW FIRM**
Julie Pettit (*pro hac vice* forthcoming)
David B. Urteago (*pro hac vice* forthcoming)
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076
Email: *jpettit@pettitfirm.com*
            *durteago@pettitfirm.com*

**LYNN PINKER HURST & SCHWEGMANN, LLP**
Michael K. Hurst (*pro hac vice* forthcoming)
Chris Schwegmann (*pro hac vice* forthcoming)
Yaman Desai (*pro hac vice* forthcoming)
Jessica Cox (*pro hac vice* forthcoming)
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839
Email: *mhurst@lynnllp.com*
            *cschwegmann@lynnllp.com*
            *ydesai@lynnllp.com*
            *jcox@lynnllp.com*

*Attorneys for Plaintiff and the Proposed Class*

29